FILED

'2008 JUL 15 PM 2: 29

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA E. TEAZE,<br><br>　　　　　　　　　　Plaintiff,<br>vs.<br><br>CITY OF SAN DIEGO, a municipal corporation; SAN DIEGO POLICE DEPARTMENT, a sub-agency of the City of San Diego; WILLIAM LANSDOWNE, Chief of Police, in his individual and official capacities; POLICE OFFICERS DOLEZAL, HALL, DERROUGH, NOUVONG, and ZEPEDA, in their individual and official capacities,<br><br>　　　　　　　　　　Defendants. | CASE NO. 07CV80 WQH (AJB)<br><br>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

HAYES, Judge:

　　Pending before the Court is Defendants' motion for summary judgment. (Doc. # 40). The Court heard oral argument on this matter on Monday, June 16, 2008.

### PROCEDURAL BACKGROUND

　　On January 11, 2007, Plaintiff Patricia E. Teaze filed a section 1983 civil rights Complaint against Defendants City of San Diego, the San Diego Police Department, San Diego Police Chief William Lansdowne, and Police Officers Dolezal, Hall, Derrough, Nouvong, and Zepeda. (Doc. # 1). The Complaint alleged that Defendants violated Plaintiff's constitutional rights when Defendant Officers forcibly entered Plaintiff's house on February 24, 2005. (Doc. # 1). On February 7, 2007,

Defendants filed an answer to the Complaint. (Doc. # 6).

On July 20, 2007, the parties filed a joint motion to allow Plaintiff to file a First Amended Complaint. (Doc. # 18). On July 31, 2007, the Court granted the motion and filed the First Amended Complaint which Plaintiff submitted to the Court. (Docs. # 19, 25). The First Amended Complaint asserts federal claims pursuant to 42 U.S.C. § 1983 for violations of Plaintiff's constitutional rights under the United States Constitution, as well as state law claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and violation of CAL. CIV. CODE § 52.1. (Doc. # 25). On October 16, 2007, Defendants answered the First Amended Complaint and asserted affirmative defenses. (Doc. # 20).

On January 28, 2008, Defendants filed a motion for summary judgment. (Doc. # 26). On March 10, 2008, the Court denied Defendants' motion for summary judgment without prejudice to allow both parties an opportunity to submit additional evidence. (Doc. # 39). On May 16, 2008, Defendants filed the pending motion for summary judgment. (Doc. # 40). On June 3, 2008, Plaintiff filed an opposition. (Doc. # 43). On June 9, 2008, Defendants filed a reply. (Doc. # 48).

On June 16, 2008, the parties appeared before the Court for oral argument.

## FACTUAL BACKGROUND

In February of 2005, Plaintiff Patricia E. Teaze and her roommate, David Woodcock, lived at 6368 Cleo Street, in San Diego, California. *Declaration of Patricia E. Teaze* (Doc. # 48-3, Ex. B at ¶¶ 4-5); *Declaration of David Woodcock* (Doc. # 48-3, Ex. C at ¶¶ 4-5); *Deposition of Patricia E. Teaze* (Doc. # 48-3, Ex. A at 20). Plaintiff was 75 years old at the time, and Woodcock, to whom Plaintiff is now married, was 42 years old. (Doc. # 48-3, Ex. A at 15, 51-52). Plaintiff's family did not like Woodcock. (Doc. # 48-3, Ex. A at 50); *Uncertified Transcript of Oral Argument June 16, 2008* at 14, 17, 20. In and around December of 2004, Police arrested Woodcock for possession of crack cocaine, and Plaintiff testified at deposition that Woodcock sometimes smoked crack cocaine in their residence. (Doc. # 48-3, Ex. A at 50-51); (Doc. # 48-3, Ex. D at 3). Plaintiff testified that Plaintiff's family was "putting the screws on David, coming around to beat him up," and "threatening his life." (Doc. # 48-3, Ex. A at 50).

On February 24, 2005, Plaintiff's daughter, Margaret Cooper, called the Police to report that

| | |
|---|---|
| 1 | her mother had been the victim of elder abuse. *Police Report* (Doc. # 48-3, Ex. D at 1); (Doc. # 48-3, |
| 2 | Ex. A at 16). Specifically, Cooper alleged that Plaintiff "had bruises and a busted lip caused by |
| 3 | Woodcock." (Doc. # 48-3, Ex. D at 1); *see also* (Doc. # 48-3, Ex. A at 20-21). At approximately |
| 4 | 11:00 A.M. on February 24, 2005, Defendant San Diego Police Officers Zepeda and Derrough arrived |
| 5 | at Plaintiff and Woodcock's residence to investigate Cooper's report. (Doc. # 48-3, Ex. D at 1); (Doc. |
| 6 | # 48-3, Ex. A at 19). Officers Zepeda and Derrough knocked at the front door of the residence, but |
| 7 | received no response. (Doc. # 48-3, Ex. D at 1). Officers Zepeda and Derrough then "checked the |
| 8 | exterior of the residence" for an "unlocked window or door." (Doc. # 48-3, Ex. D at 1); (Doc. # 48-3. |
| 9 | Ex. A at 21-23). |
| 10 | After checking the exterior of the residence, Officer Zepeda interviewed an individual at a |
| 11 | neighboring residence, and the individual stated that she had seen the "elderly female" living at 6368 |
| 12 | Cleo St. the evening before. (Doc. # 48-3, Ex. D at 1). Officer Zepeda then discovered a vehicle |
| 13 | registered to Plaintiff sitting in the driveway of the 6368 Cleo St. residence with the keys in the |
| 14 | ignition. (Doc. # 48-3, Ex. D at 1). Thereafter, Officer Derrough contacted dispatch to further |
| 15 | investigate Margaret Cooper's report of elder abuse. (Doc. # 48-3, Ex. D at 1). Officers Zepeda and |
| 16 | Derrough learned that Margaret Cooper had not personally seen Plaintiff's injuries, but that Cooper |
| 17 | had learned of the injuries from her brother who had seen the injuries. (Doc. # 48-3, Ex. D at 1). |
| 18 | At approximately 11:37 a.m. Defendant Officer Sgt. Dolezal arrived on the scene and |
| 19 | instructed Zepeda and Derrough to try to unlock the residence's front security door with the keys |
| 20 | located in the vehicle registered to Plaintiff. (Doc. # 48-3, Ex. D at 1); (Doc. # 48-3, Ex. E at 1). The |
| 21 | officers were unsuccessful in unlocking the door. (Doc. # 48-3, Ex. D at 1). Thereafter, Sgt. Dolezal |
| 22 | contacted dispatch to request additional officers to assist with a "lock pick kit," and the officers on |
| 23 | scene further attempted to determine whether Plaintiff was in the residence. (Doc. # 48-3, Ex. D at |
| 24 | 1). The officers learned that Margaret Cooper "was sure" that her mother was in the residence, and |
| 25 | that Cooper believed that Woodcock was possibly holding Plaintiff "hostage." (Doc. # 48-3, Ex. E |
| 26 | at 2). |
| 27 | At approximately 11:59 p.m., Defendant Officers Hall and Nouvong arrived on the scene with |
| 28 | the lock pick kit. (Doc. # 48-3, Ex. E at 2); (Doc. 48-3, Ex. D at 1). Thereafter, Margaret Cooper |

arrived on scene to speak with the officers. (Doc. # 48-3, Ex. D at 1); (Doc. # 48-3, Ex. E at 2). In an attempt to investigate the report of elder abuse and to obtain a key to Plaintiff's residence, Officer Zepeda drove with Cooper to Cooper's brother's house. (Doc. # 48-3, Ex. D at 1). When Zepeda and Cooper discovered that Cooper's brother was not home, they drove back to Plaintiff's residence. (Doc. # 48-3, Ex. D at 1).

During the time that Defendant Officers attempted to gain entry into Plaintiff's residence, Plaintiff and Woodcock were in the residence with the shades drawn. (Doc. # 48-3, Ex. A at 22). Plaintiff and Woodcock heard the Defendant Officers shouting "Police!" outside the residence, and also heard the Officers knock and bang on the front door and the exterior windows. (Doc. # 48-3, Ex. A at 21). Woodcock "peeked" out the window to confirm the Police presence, and informed Plaintiff that "[t]here [were] seven Police cars and a whole bunch of cops out there." (Doc. # 48-3, Ex. B at ¶ 6). Neither Plaintiff nor Woodcock, however, called the Police to ask them to leave, opened the doors or windows, or otherwise attempted to communicate with the Police. (Doc. # 48-3, Ex. A at 22-23, 36). Rather, Plaintiff stated at deposition that she and Woodcock, "were sitting on the sofa," and "just hoping [the Police] would go away so we could get on with the things that we had planned to do that morning." (Doc. # 48-3, Ex. A at 23-24). Plaintiff further stated that she was hoping that the Police would think that she was not home and "go away," in part because Plaintiff "had been harassed by the Police on many previous occasions." (Doc. # 48-3, Ex. A at 24); (Doc. # 48-3, Ex. B at ¶ 6).

Plaintiff testified that the Police knocked on the door and windows and attempted to gain entrance to the house for approximately ten to fifteen minutes. (Doc. # 48-3, Ex. A at 22-24). Thereafter, the house was quiet, and Woodcock peeked out the front window a second time to determine if the Police were still present. (Doc. # 48-3, Ex. B at ¶ 6); (Doc. # 48-3, Ex. C at ¶ 7). Woodcock discovered that the Police were still present, but had moved their cars down the street. (Doc. # 48-3, Ex. C at ¶ 7). Woodcock stated in his declaration that, "[t]his was a trick performed by the Police to get us to move or make some kind of movement so that they could detain me and badger Pat." (Doc. # 48-3, Ex. C at ¶ 7). After peeking out the window the second time, Woodcock returned to the family room to sit with Plaintiff. (Doc. # 48-3, Ex. C at ¶ 8). Thereafter, the Police returned to the house "and the banging and yelling started up again. (Doc. # 48-3, Ex. C at ¶ 8).

Sometime after 12:00 P.M., Defendant Officers pried open the front security door and two Police officers, a man and a woman, entered Plaintiff's house. (Doc. # 48-3, Ex. A at 17); (Doc. # 48-3, Ex. B at ¶ 7). The officers moved quickly through the house yelling, "This is the Police! This is the Police! " and yelled "hands over your head, drop to your knees!" (Doc. # 48-3, Ex. C at ¶ 8); (Doc. # 48-3, Ex. A at 26); (Doc. # 48-3, Ex. B at ¶ 7). As Defendant Officers entered Plaintiff's residence, their guns were drawn. (Doc. # 48-3, Ex. A at 26-27). Plaintiff and Woodcock immediately dropped to their knees and put their hands over their heads when they heard the shouting officers. (Doc. # 48-3, Ex. C at ¶ 10); (Doc. # 48-3, Ex. A at 17, 26).

Plaintiff and Woodcock remained on their knees for approximately one minute before Defendant Officers asked them to sit on the couch. (Doc. # 48-3, Ex. A at 26-27, 38). During the time that Plaintiff and Woodcock were on their knees, Defendant Officers had their guns drawn. (Doc. # 48-3, Ex. A at 27). Thereafter, the male officer removed Woodcock from the house and placed him in a Police car outside, and the female officer attempted to question Plaintiff. (Doc. # 40-3, Ex. 2 at 37-38); (Doc. # 48-3, Ex. C at ¶ 10). Plaintiff refused to answer questions without the presence of her attorney, and further refused to remove her sweater when the female officer asked Plaintiff to remove it so that the officer could check for bruises. (Doc. # 48-3, Ex. A at 27, 29-31); (Doc. # 48-3, Ex. D at 1). With respect to removing her sweater, Plaintiff testified at deposition that she wasn't "uncomfortable" taking off her sweater, but that she "just didn't see any reason to be stripping my clothes off because some policeman breaks in my house." (Doc. # 48-3, Ex. A at 30).

Sometime after Defendant Officers removed Woodcock from the house, Plaintiff's daughter Margaret Cooper entered the house and "started telling the police what to do." (Doc. # 48-3, Ex. B at ¶ 8); (Doc. # 40-3, Ex. 2 at 28). Plaintiff, still refusing to remove her sweater, then retrieved a letter from her attorney, Harold Ayer, and handed it to the female Police officer. (Doc. # 48-3, Ex. B at ¶ 9); (Doc. # 48-3, Ex. A at 31). The letter described that Plaintiff had a temporary conservator of her "finances," but did not have a conservator of her "person." (Doc. # 48-3, Ex. B at ¶ 9). As Defendant Officers finished reading the letter from Plaintiff's attorney, Plaintiff's daughter Margaret Cooper went to Plaintiff and tried to pull Plaintiff's sweater off. (Doc. # 48-3, Ex. B at ¶ 10). The male officer ordered Cooper to stop and to leave immediately. (Doc. # 48-3, Ex. B at ¶ 10). Thereafter, Defendant

1  Officers left the house "without a word of apology." (Doc. # 48-3, Ex. B at ¶ 12).

2  During the incident of February 24, 2005, no officer touched Plaintiff at any time. (Doc. # 48-3, Ex. A at 39). However, Defendant Officers frightened Plaintiff when they broke into the house, and Plaintiff stated in her declaration that she feared for her life. (Doc. # 48-3, Ex. B at ¶ 7). Plaintiff "was petrified" that the Defendant Officers "might get trigger happy or accidently pull a trigger and either kill or seriously injure" both Plaintiff and Woodcock, and the incident "totally stressed" Plaintiff. (Doc. # 48-3, Ex. B at ¶ 7). Plaintiff stated in her declaration that the "entire incident" made her "seriously ill," and she continues to worry that "the same thing will occur in the future." (Doc. # 48-3, Ex. B at ¶¶ 11-12).

## STANDARD OF REVIEW

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party may meet this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322-23. If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

If the moving party satisfies its initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Anderson*,

477 U.S. at 252. Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quoting FED. R. CIV. P. 56(e)) (internal quotations omitted).

In ruling on a motion for summary judgment, "[t]he district court may limit its review to the documents submitted for purposes of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001). The court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587. "Credibility determinations [and] the weighing of evidence . . . are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## DISCUSSION

Defendants contend that this Court should grant summary judgment in favor of Defendants on Plaintiff's section 1983 civil rights claims because the undisputed facts do not establish a constitutional violation and Defendants are entitled to qualified immunity. Defendants contend that Plaintiff has not established that Defendants violated Plaintiff's constitutional rights to free association, counsel, due process, and to be free from the use of excessive force. Even assuming a constitutional violation, Defendants contend that their actions were objectively reasonable under the facts presented and entitle Defendants to qualified immunity. Defendants City of San Diego, San Diego Police Department, and Police Chief William Lansdowne contend that they are entitled to summary judgment because Plaintiff has not alleged or presented evidence that the Police Department has a policy, custom, or practice of unconstitutional action. Finally, Defendants contend that they are entitled to summary judgment on Plaintiff's state claims for negligent and intentional infliction of emotional distress and violation of the California Civil Code because Defendant Officers' acts were not outrageous or reckless under the facts presented and Defendants are entitled to immunity under state statutory law.

Plaintiff contends that summary judgment should not be granted because Plaintiff has established that Defendants violated Plaintiff's First Amendment right to associate, Fifth Amendment

rights to due process and counsel, and Fourteenth Amendment right to substantive due process. Plaintiff contends that Defendants are not entitled to qualified immunity because their actions were objectively unreasonable under the facts presented.

## I. Civil Rights Claims Pursuant to 42 U.S.C. § 1983

Title 42 U.S.C. § 1983 provides a cause of action against any person who, under color of state law, deprives any citizen of any rights, privileges, or immunities secured by the Constitution and laws of the United States. *See Wyatt v. Cole*, 504 U.S. 158, 161 (1992). "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Id.* Though § 1983 creates "a species of tort liability that on its face admits of no immunities," *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976), the United States Supreme Court has "recognized qualified immunity for government officials where it [is] necessary to preserve their ability to serve the public good . . . ." *Wood v. Strickland*, 420 U.S. 308, 319 (1975). Police officers are one class of government officials entitled to qualified immunity. *See Malley v. Briggs*, 475 U.S. 335, 341-343 (1986).

The United States Supreme Court has established a two-part analysis for determining the propriety of qualified immunity in a suit against an officer. *Saucier v. Katz*, 533 U.S. 194, 210 (2001). First, a court must consider whether the facts alleged show that the officer's conduct violated a constitutional right. *Id.* at 201. In so considering, the court must view the alleged facts in the light most favorable to the party asserting injury. *Id.* Second, and assuming a constitutional violation can be made from the facts, the court must determine whether the constitutional right was clearly established in light of the specific context of the case. *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.

Plaintiff asserts multiple claims pursuant to 42 U.S.C. § 1983, including violation of her right to associate, right to due process, right to counsel and right to be free from excessive force. Defendants assert qualified immunity as a defense to each claim.

### A. First Amendment - Right to Associate

Plaintiff contends that Defendants violated her First Amendment right to associate when they forcibly entered Plaintiff's house.

"An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984). Accordingly, the United States Supreme Court "has recognized a right to associate for the purpose of engaging in . . . activities protected by the First Amendment–speech, assembly, petition for the redress of grievances, and the exercise of religion." *IDK, Inc. v. County of Clark*, 836 F.2d 1185, 1191 (9th Cir. 1988). "The first amendment's freedom of association protects groups whose activities are explicitly stated in the amendment: speaking, worshiping, and petitioning the government." *Id.* at 1192.

Plaintiff contends that Defendants violated her First Amendment rights to associate with her roommate, Woodcock, when Defendants forcibly entered Plaintiff's residence. However, no fact establishes or gives rise to an inference that Plaintiff and Woodcock were associating for the purposes of "engaging in . . . activities protected by the First Amendment," nor does Plaintiff allege that she and Woodcock were associating in a way which entitles Plaintiff to the protection of the First Amendment. *IDK, Inc.*, 836 F.2d at 1191. As noted by Court of Appeal for the Ninth Circuit, "[w]hile the first amendment fully protects expression about philosophical, social, artistic, economic, literary, ethical, and other topics, . . . it does not protect every communication or every association . . ." *Id.* at 1194. Here, Plaintiff has failed to allege or submit facts showing that Plaintiff and Woodcock were engaged in expressive or other conduct which is protected by the First Amendment. *See Christian Legal Society v. Walker*, 453 F.3d 853, 862 (7th Cir. 2006) ("It goes without saying that a group must engage in expressive association in order to avail itself of the First Amendment's protections for expressive association."); *Wine & Spirits Retails, Inc. v. Rhode Island*, 418 F.3d 36, 50 (1st Cir. 2005) (First Amendment right to associate requires expressive conduct).

The Court finds that there are no genuine issues of material fact which would preclude summary judgment on Plaintiff's claim for violation of the First Amendment. Viewing the underlying undisputed facts in the light most favorable to Plaintiff, the Court concludes that the facts to do not

establish a violation of Plaintiff's First Amendment right to associate. In addition, even assuming the facts did establish a constitutional violation, the Court concludes that Defendants would be entitled to qualified immunity because it would not be clear to a reasonable officers that Defendants' actions were unlawful under the situation confronted by Defendants.

Defendants' motion for summary judgment is GRANTED with respect to Plaintiff's claim for violation of the First Amendment.

### B. Fourteenth Amendment - Right to Association / Substantive Due Process

Plaintiff contends that Defendants violated her Fourteenth Amendment right to substantive due process when Defendants forcibly entered Plaintiff's house and disrupted Plaintiff and her roommate.

The Due Process clause of the Fourteenth Amendment protects "certain kinds of highly personal relationships" as "fundamental rights." *IDK, Inc.*, 836 F.2d at 1192 (citing *Roberts*, 468 U.S. at 618) (internal citations omitted); *Nat'l Assn. for the Advancement of Psych. v. Calif. Bd. Of Psych.*, 228 F.3d 1043, 1050 (2000). Specifically, the Fourteenth Amendment protects those relationships "that attend the creation and sustenance of a family," and other similar "highly personal relationships." *IDK, Inc.*, 836 F.2d at 1993 (citing *Roberts*, 468 U.S. at 618-19). "By the very nature of such relationships, one is involved in a relatively few intimate associations during his or her lifetime," and "[t]he factors relevant in determining whether a particular association can claim the protection of the due process clause are the group's size, its congeniality, its duration, the purposes for which it was formed, and the selectivity in choosing participants." *Id.*; *see also Roberts*, 468 U.S. at 620. Not all relationships are entitled to Fourteenth Amendment protections, since only relationships with certain qualities, "are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty." *Roberts*, 468 U.S. at 620; *see also Nat'l Assn. for the Advancement of Psych.*, 228 F.3d at 1049-50; *IDK, Inc.*, 836 F.2d at 1193. A "friendship" is not entitled to the protection of the Fourteenth Amendment's right to associate. *Granville v. City of Portland*, Civil No. 02-1016-HA, 2004 U.S. Dist. LEXIS 11353, *34-35 (D. Or. Jun. 14, 2004); *Hudson v. Los Angeles*, CASE NO. CV 06-942-DSF (Ssx), 2006 U.S. Dist. LEXIS 96713, *12 (C.D. Cal. Sept. 7, 2006).

The Court concludes that there are no genuine issues of material fact with respect to Plaintiff's

claim under the Fourteenth Amendment. The undisputed facts before the Court establish that Plaintiff and Woodcock were roommates on February 24, 2005. *See Transcript of Oral Argument June 16, 2008* at 14, 17, 20. The Court finds that Plaintiff has not alleged or submitted evidence which would indicate that Plaintiff and Woodcock were involved in the kind of "highly personal relationship" protected by the Fourteenth Amendment in February of 2005. The Court concludes that the facts viewed in the light most favorable to Plaintiff do not entitle Plaintiff to protections of Fourteenth Amendment's right to associate.

      Even if Plaintiff and Woodcock's relationship was the kind of "highly personal relationship" which is entitled to protection under the Fourteenth Amendment, the Court concludes that Defendants' actions would not violate Plaintiff's Fourteenth Amendment rights. The undisputed facts indicate that Defendants believed Plaintiff may have been in danger when they entered her residence. The facts further indicate that Defendants only entered the residence after they carefully and cautiously determined that Plaintiff was in the residence, and only after Defendants had announced their presence for approximately fifteen minutes. Plaintiff intentionally ignored Defendants' attempts to gain a peaceful entrance into Plaintiff's residence by sitting on the couch and hoping that Defendants would "go away." (Doc. # 48-3, Ex. A at 23-24). The Court concludes that Defendants' actions in entering Plaintiff's house did not violate Plaintiff's Fourteenth Amendment rights as a matter of law. The Court further concludes that Defendants' actions under the undisputed facts before the Court would entitle Defendants to qualified immunity because it would not have been clear to a reasonable officer that Defendants' actions were unlawful in the situation confronted. *See Saucier*, 533 U.S. at 202.

      Defendants' motion for summary judgment is GRANTED with respect to Plaintiff's claim under the Fourteenth Amendment.

### C. Fifth Amendment - Right to Due Process / Right to Counsel

      Plaintiff contends that Defendants' actions in entering Plaintiff's home and questioning Plaintiff without the presence of counsel violated her Fifth Amendment rights to due process and the assistance of counsel.

      "The Due Process Clause of the Fifth Amendment . . . appl[ies] only to actions of the federal government–not to those of state or local governments." *Lee v. City of Los Angeles*, 250 F.3d 668, 687

(9th Cir. 2001); *see also Anderson v. Campos*, 06-CV-1824 OWW DLB, 2007 U.S. Dist. LEXIS 60007, *10-11 (E.D. Cal. Aug. 8, 2007). It is undisputed that Defendants are agents of the City of San Diego, a local government, and that no Defendant is a federal actor. Accordingly, the Court concludes that Plaintiff's due process claim pursuant to the Fifth Amendment fails as a matter of law because the Fifth Amendment's due process clause does not apply to the actions of local government. *See Lee*, 250 F.3d at 687.

Though the contours of Plaintiff's Fifth Amendment right to counsel claim are not entirely clear, it appears that Plaintiff contends that she had a right to counsel pursuant to the procedural due process component of the Fifth Amendment. *Opposition to MSJ* (Doc. # 43-1) at 12. As noted previously, the due process clause of the Fifth Amendment does not apply to actions of state or local actors, and therefore, to the extent that Plaintiff claims a right to counsel based on the Fifth Amendment's Due Process clause, Plaintiff's claim fails as a matter of law. The Court notes that Plaintiff does not allege or submit evidence which would establish that she was arrested or otherwise subject to a custodial interrogation. Accordingly, the Court concludes that Plaintiff was not entitled to counsel or Miranda warnings pursuant to the Fifth Amendment's "privilege against compulsory self-incrimination." *United States v. Pace*, 833 F.2d 1307, 1312-13 (9th Cir. 1987).

**D. Fourth Amendment - Excessive Force**

Plaintiff's First Amended Complaint does not specifically allege a claim for excessive force under the Fourth Amendment, and Plaintiff's counsel stated at oral argument on March 10, 2008, and June 16, 2008, that the First Amended Complaint did not include a claim pursuant to the Fourth Amendment. *See* (Doc. # 43-1 at 15); *Uncertified Transcript of Oral Argument March 10, 2008* at 12-13; *Uncertified Transcript of Oral Argument June 16, 2008* at 5-6. Accordingly, the Court concludes that Defendant is entitled to summary judgment on any Fourth Amendment claim which Plaintiff now contends exists within the First Amended Complaint. However, even assuming that the First Amended Complaint does allege an excessive force claim pursuant to the Fourth Amendment, the Court concludes that Defendants are nevertheless entitled to summary judgment as outlined below.

"'[U]se of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness.'" *Tekle v. United States*, 457 F.3d 1088, 1094 (9th Cir. 2006) (quoting

*Saucier*, 533 U.S. at 202). In analyzing the reasonableness of the force used, a court must balance, "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

The legal framework for determining whether an officer has utilized excessive force is clearly established. *Tekle*, 457 F.3d at 1094. First, a court must analyze the severity of the force applied. *Id.*, (citing *Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003). Second, and most important, a court must analyze the need for the force. *Tekle*, 457 F.3d at 1094 (citing *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003)). In determining the need for force, a court considers the severity of any crime committed, whether a person poses an immediate threat to the safety of officers or other persons, and whether a person is actively resisting arrest or attempting to evade arrest by flight. *Blanford v. Sacramento County*, 406 F.3d 1110, 1115 (9th Cir. 2005). Finally, a court must balance the force used against the need for using it, and determine whether the force used was "greater than is reasonable under the circumstances." *Id.* (quoting *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002)).

It is undisputed that no Defendant ever touched Plaintiff during the relevant incident on February 24, 2005. (Doc. # 48-3, Ex. A at 39). The facts in the light most favorable to Plaintiff indicate that a member of Plaintiff's family notified Defendant Officers that Plaintiff was the victim of elder abuse, and that Plaintiff was at home with the alleged abuser on February 24, 2005. The facts further indicate that after announcing their presence for approximately 15 minutes,[1] investigating Plaintiff's whereabouts and attempting to corroborate the elder abuse claim, Defendant Officers entered Plaintiff's home with guns drawn, yelling "This is the Police! This is the Police! . . . Hands over your head, drop to your knees." (Doc. # 48-3, Ex. A at 17, 26); (Doc. # 48-3, Ex. C at ¶ 8); (Doc. # 48-3, Ex. B at ¶ 7). Defendants pointed their guns at Plaintiff and Woodcock for approximately one minute. (Doc. # 48-3, Ex. A at 26-27). Plaintiff contends that Defendant Officers' use of guns was clearly unconstitutional under the facts before the Court. Defendants contend that they are entitled to

---

[1] Plaintiff testified at deposition that she heard the police announcing their presence outside her residence but ignored the police's attempts to contact her. (Doc. # 48-3, Ex. A at 21-24). Plaintiff testified that she ignored Defendants' attempts to contact her because she wanted the Police to think that she wasn't home and "go away." (Doc. # 48-3, Ex. A at 23-24).

qualified immunity because the undisputed facts do not establish a constitutional violation and it would not be clear to a reasonable officer that Defendants' actions were unlawful under the situation confronted.

Plaintiff contends, and this Court agrees, that the use of a gun can constitute excessive force under certain factual scenarios. *See Robinson v. Solano County*, 278 F.3d 1007, 1013-16 (9th Cir. 2002). However, under the undisputed facts before the Court, the Court concludes that Defendant Officers' limited use of their guns was justified and did not violate Plaintiff's constitutional rights. As noted above, Defendant Officers were informed by a member of Plaintiff's family that Plaintiff was the victim of elder abuse and potentially a hostage in the residence. Defendant Officers then attempted to gain access to the residence and contact Plaintiff for approximately fifteen minutes before entering the residence to ensure Plaintiff's safety. The Court concludes that Defendants' use of their guns as they entered Plaintiff's residence for a brief period to establish control over the interior and ensure Plaintiff's safety was not unreasonable and did not violate Plaintiff's constitutional rights as a matter of law.[2] In addition, and even assuming that Defendants' use of their firearms violated Plaintiff's constitutional rights, the Court concludes that Defendants would be entitled to qualified immunity because it would not have been clear to a reasonable officer that Defendants' actions in using their guns was unlawful under the factual scenario confronted.

Defendants' motion for summary judgment is GRANTED with respect to Plaintiff's claim under the Fourth Amendment.

### E. Plaintiff's § 1983 Claims Against the City of San Diego and the San Diego Police Department

Plaintiff's First Amended Complaint alleges claims pursuant to 42 U.S.C. § 1983 against Defendants City of San Diego, the San Diego Police Department, and Chief of Police William Lansdowne. It appears that Plaintiff alleges that Defendants City of San Diego, San Diego Police Department, and Chief of Police William Lansdowne violated Plaintiff's rights to due process, counsel, and free association.

"A municipality may be held liable under 42 U.S.C. § 1983 'when execution of a government's

---

[2] In addition to never touching Plaintiff, Defendant Officers never placed Plaintiff under arrest or handcuffed her.

policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . .'" *Jackson v. City of Bremerton*, 268 F.3d 646, 653 (9th Cir. 2001). "A supervisor may be held liable under 42 U.S.C. § 1983 if he or she was personally involved in the constitutional deprivation or a sufficient causal connection exists between the supervisor's unlawful conduct and the constitutional violation." *Id.* Neither a municipality nor a supervisor can be held liable under 42 U.S.C. § 1983 where no underlying "constitutional violation has occurred." *Id.*

The Court has previously concluded that Defendant Officers did not violate Plaintiff's constitutional rights under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Accordingly, the Court concludes that Plaintiff's claims pursuant to 42 U.S.C. § 1983 against the City of San Diego, the San Diego Police Department, and Chief of Police William Lansdowne fail as a matter of law.

Defendant's motion for summary judgment is GRANTED with respect to Plaintiff's claims against Defendants City of San Diego, San Diego Police Department, and William Lansdowne.

## II. State Law Claims

### A. California Civil Code

Plaintiff's First Amended Complaint asserts a claim against Defendants for violation of CAL. CIV. CODE § 52.1. (Doc. # 25 at 8-9). Specifically, Plaintiff alleges that Defendants violated CAL. CIV. CODE § 52.1 by interfering and attempting to interfere with Plaintiff's human and civil rights by recklessly and outrageously entering Plaintiff's residence. (Doc. # 25 at 8-9).

CAL. CIV. CODE § 52.1(b) provides that,

> **(b)** Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with [by threats, intimidation, or coercion], may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages . . . .

*See also* CAL. CIV. CODE § 52.1(a). The California Legislature "enacted CAL. CIV. CODE 52.1 to stem the tide of hate crimes," and the statute "requires an attempted or completed act of interference with a legal right, accompanied by a form of coercion." *Austin B. v. Escondido Union Sch. Dist.*, 149 Cal. App. 4th 860, 882 (2007) (internal citations omitted). In order to establish a claim under CAL. CIV.

CODE § 52.1(b), a plaintiff must allege and submit facts which show that Defendants interfered with or attempted to interfere with Plaintiff's State or Federal Constitutional rights by threatening or committing violent acts. *Austin B.*, 149 Cal. App. 4th at 882. There must be allegations and evidence that Defendants threatened, intimidated, or coerced Plaintiff. *Id.*; *see also City and County of San Francisco v. Ballard*, 136 Cal. App. 4th 381, 408 (2006).

The First Amended Complaint does not include allegations that Defendants threatened, intimidated, coerced, or attempted to threaten, intimate, or coerce Plaintiff. Neither do the undisputed facts before the Court indicate that Defendants threatened, intimidated, or coerced Plaintiff in any manner. Accordingly, and viewing the facts in the light most favorable to the Plaintiff, the Court concludes that Plaintiff's claim pursuant to CAL. CIV. CODE § 52.1 fails as a matter of law.

Even assuming Plaintiff was able to establish that Defendants threatened, coerced, or intimidated Plaintiff in violation of CAL. CIV. CODE § 52.1, the Court concludes that Defendants would be entitled to immunity pursuant CAL. GOV'T CODE § 820.2, which "provides a public employee with immunity from liability for 'an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion was abused.'" *Risso v. County of El Dorado*, 07-cv-451-GEB-DAD, 2008 U.S. Dist. LEXIS 5326, *12-14 (E.D. Cal. Jan. 9, 2008). The undisputed facts before the Court indicate that Defendant Officers were told that Plaintiff was the victim of elder abuse and was in danger, and that thereafter Defendant Officers made every attempt to gain a peaceful entry into Plaintiff's residence by announcing their presence and knocking on doors and windows for approximately fifteen minutes. Only after Defendant Officers' attempt to gain peaceful entry failed did Defendants attempt to corroborate the claims of elder abuse and, ultimately, enter Plaintiff's residence. The Court concludes that Defendants' discretionary decision to enter the house with guns drawn to investigate a recent allegation of elder abuse was reasonable and protected under CAL. GOV. CODE § 820.2 based upon the undisputed facts before the Court.

### B. Intentional Infliction of Emotional Distress

Plaintiff contends that Defendants are liable for intentional infliction of emotional distress for outrageously and recklessly entering Plaintiff's residence with guns drawn.

| | |
|---|---|
| 1 | "The elements of the tort of intentional infliction of emotional distress are '(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.'" *Christensen v. Superior Court*, 54 Cal.3d 868, 903 (1991) (citing *Davidson v. City of Westminster*, 32 Cal.3d 197, 209 (1982)). In order for conduct to be "outrageous," it "must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Davidson*, 32 Cal.3d at 209. "Severe emotional distress [is] emotional distress of such a substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it." *Fletcher v. Western Life Insurance Co.*, 10 Cal. App.3d 376, 397 (1970). |

After reviewing the undisputed facts before the Court in the light most favorable to Plaintiff, the Court concludes that Defendants' actions in entering Plaintiff's residence with guns drawn were not "outrageous" and do not establish a claim for intentional infliction of emotional distress. Defendant Officers were informed that Plaintiff had been the victim of elder abuse and that Plaintiff was potentially being held hostage. Defendants thereafter tried to gain peaceful entry into Plaintiff's residence, but were unable to do so because Plaintiff and Woodcock intentionally ignored Defendants' attempts to contact Plaintiff and enter the residence. As a result, Defendants elected to enter the house by force to ensure Plaintiff's safety. The Court concludes that Defendants' actions in entering the residence with guns drawn were not outrageous given the facts known to Defendants at the time. Defendants' actions were not "so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Davidson*, 32 Cal.3d at 209.

Defendants' motion for summary judgment is GRANTED with respect to Plaintiff's claim for intentional infliction of emotional distress.

### C. Negligent Infliction of Emotional Distress

"The law of negligent infliction of emotional distress in California is typically analyzed . . . by reference to two 'theories' of recovery: the 'bystander' theory and the 'direct victim' theory." *Gu v. BMW of North America, LLC*, 132 Cal. App. 4th 195, 204 (2005). In this case, Plaintiff alleges and submits evidence that she was the direct victim of Defendants' negligent infliction of emotional

1 | distress.

2 | "In its decisions addressing the direct victim theory [of negligent infliction of emotional
3 | distress], the California Supreme Court has emphasized that 'there is no independent tort of negligent
4 | infliction of emotional distress.'" *Id.* (citing *Potter v. Firestone Tire & Rubber Co.*, 6 Cal.4th 965, 984
5 | (1993). "Instead, '[t]he tort is negligence, a cause of action in which duty to the plaintiff is an essential
6 | element.'" *Id.* (citation omitted). "[U]nless the defendant has assumed a duty to plaintiff in which the
7 | emotional condition of the plaintiff is an object, recovery is available only if the emotional distress
8 | arises out of the defendant's breach of some other legal duty and the emotional distress is proximately
9 | caused by the breach of duty." *Potter*, 6 Cal.4th at 985.

10 | Plaintiff contends that Defendants had a duty to exercise reasonable care toward Plaintiff when
11 | Defendants entered Plaintiff's residence, and that Defendants breached that duty by outrageously and
12 | recklessly entering Plaintiff's house with guns drawn.

13 | After reviewing the undisputed facts before the Court, the Court concludes that Defendants did
14 | not breach any duty to Plaintiff as a matter of law. Defendant Officers reasonably entered Plaintiff's
15 | residence in order to ensure Plaintiff's safety, and did so only after announcing their presence for
16 | approximately fifteen minutes and attempting to corroborate the allegations of elder abuse and
17 | Plaintiff's presence at the residence. The Court concludes that Defendants' actions were reasonable
18 | and did not breach any duty to protect Plaintiff's emotional well-being which may have arisen as the
19 | result of a special relationship between Plaintiff and Defendants.

20 | Defendants' motion for summary judgment is GRANTED with respect to Plaintiff's claim for
21 | negligent infliction of emotional distress.

22 | /
23 | /
24 | /
25 | /
26 | /
27 | /
28 |

## CONCLUSION

After reviewing the undisputed facts before the Court, the Court hereby GRANTS Defendants' motion for summary judgment (Doc. # 40) in its entirety. The Clerk of the Court is Ordered to enter judgment in favor of Defendants and against Plaintiff on all claims in the First Amended Complaint, and thereafter close this case.

**IT IS SO ORDERED.**

DATED: 7/15/-V

WILLIAM Q. HAYES
UNITED STATES DISTRICT JUDGE